E-FILED
Friday, 18 March, 2022 02:08:37 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JAMES RAY MANUEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.  1:20-cv-1161 |
| | ) | |
| LUANN WALKER, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>ORDER & OPINION</u>

Due to Petitioner's repeated failures to comply with the Court's orders and prosecute this case, the Petition (doc. 1) is dismissed with prejudice.

### BACKGROUND

In 2011, Petitioner was convicted of home invasion and armed robbery in Illinois state court. *People v. Manuel*, 2019 IL App (4th) 170651-U, ¶¶ 5, 8.[1]

To challenge that conviction, Petitioner filed this petition for habeas corpus under 28 U.S.C. § 2254 (doc. 1) on March 26, 2020, in the Northern District of Illinois. The case was transferred to this district on April 17, 2020. (Docs. 5–7). On September 9, 2020, the Court granted Petitioner's motion for stay and abeyance with these conditions:

> On or before December 31, 2020, and every six months thereafter Petitioner MUST file a status report indicating the status of his freestanding innocence claim in state court; failure to do so may result in the stay being lifted. And Petitioner MUST file an amended petition

---

[1] A detailed recitation of the facts and testimony from Petitioner's trial can be found in the state court opinion denying his appeal as of right, *People v. Manuel*, 2013 IL App (4th) 120017-U.

raising all claims on which he wishes to proceed within 28 days of exhausting his actual innocence claim in state court, or the case will be dismissed for failure to prosecute.

(Doc. 11 at 6).

Petitioner initially complied by filing status reports in December 2020 and June 2021. (Docs. 12–14). However, Petitioner failed to file his third status report, which was due January 3, 2022. (*See* Text Orders dated 07/02/2021, 1/20/2022). The Court provided a twenty-one-day extension *sua sponte*, which Petitioner also failed to meet. (*See* Text Order dated 1/20/2022). Following that second missed deadline, four weeks have passed without any word from Petitioner.

Given Petitioner's silence, the Court investigated the status of Petitioner's attempts to exhaust the Petition. Of the Petition's three claims, only its actual innocence claim was plainly unexhausted. (*See* doc. 8 at 7). The Court discovered Petitioner's actual innocence claim was denied by the state's intermediate appellate court on May 26, 2021. *See People v. Manuel*, 2021 IL App (4th) 190238-U. However, Petitioner did not notify the Court of this in his June 2021 status report. (Doc. 14). Moreover, the Court confirmed that Petitioner has not sought review from the Illinois Supreme Court; he was required to do so by June 30, 2021, thirty-five days after the intermediate appellate court's denial. *See* Ill. Sup. Ct. R. 315(b).

In addition, the Court has repeatedly instructed Petitioner that he must "file an amended petition raising all claims on which he wishes to proceed within 28 days of exhausting his actual innocence claim in state court, or the case will be dismissed for failure to prosecute." (Doc. 11 at 6; Text Order dated 02/05/2021). Given that Petitioner's time to seek review from the Illinois Supreme Court expired on June 30,

2021, Petitioner should have filed an amended habeas petition by July 29, 2021—seven and a half months ago. Yet Petitioner has filed nothing.

## LEGAL STANDARD

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). "Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) (citations omitted).

In addition, the Federal Rules of Civil Procedure apply to habeas corpus proceedings "to the extent that the practice in such proceedings . . . is not specified in a federal statute[ or] the Rules Governing Section 2254 Cases . . . [and] has previously conformed to the practice in civil actions." Fed. R. Civ. P. 81(a)(4). The § 2254 rules do not include a rule governing the involuntary dismissal of habeas corpus petitions, *see* Rules Governing Section 2254 Cases in the United States District Courts, so the Court looks to the Federal Rules of Civil Procedure.

Under Rule 41(b), the Court may dismiss a plaintiff's (or petitioner's) case with prejudice "[i]f the plaintiff fails to prosecute [the case] or to comply with . . . a court order." Fed. R. Civ. P. 41(b); *see Ball v. City of Chicago*, 2 F.3d 752, 760 (7th Cir.

1993); *Harris v. Lariva*, No. 1:14-cv-1004, 2015 U.S. Dist. LEXIS 8393, at *1–3 (S.D. Ind. Jan. 26, 2015) (dismissing habeas petition with prejudice under Rule 41(b) for failure to prosecute). "A Rule 41(b) dismissal is a harsh sanction appropriate only when there is a clear record of delay or contumacious conduct, or where other less drastic sanctions have proved unavailing." *Collier v. SP Plus Corp.*, 889 F.3d 894, 897 (7th Cir. 2018). Because dismissing a case with prejudice "is the most severe sanction that a court may apply," the Court must carefully exercise its judicial discretion in doing so. *McMahan v. Deutsche Bank AG*, 892 F.3d 926, 931 (7th Cir. 2018). For that reason, the Seventh Circuit has instructed district courts to consider six *McMahan* factors when considering dismissal under Rule 41(b):

> 1) the frequency and magnitude of the plaintiff's failure to comply with deadlines for the prosecution of the suit,
>
> 2) the apportionment of responsibility for those failures between the plaintiff and his counsel,
>
> 3) the effect of those failures on the judge's calendar and time,
>
> 4) the prejudice, if any, to the defendant caused by the plaintiff's dilatory conduct,
>
> 5) the probable merits of the suit, and
>
> 6) the consequences of dismissal for the social objectives of the type of litigation that the suit represents.

*Mallory v. Rush Univ. Med. Ctr.*, No. 18-CV-4364, 2021 WL 458547, 2021 U.S. Dist. LEXIS 24547, at *43–44 (N.D. Ill. Feb. 9, 2021) (citing *McMahan*, 892 F.3d at 931–32).

DISCUSSION

## I.   *McMahan* Factors for Rule 41(b) Dismissal

Here, five of the six *McMahan* factors weigh in favor of dismissal.

### A.   *Frequency and Magnitude of Petitioner's Noncompliance*

Petitioner has repeatedly failed to comply with the Court's orders and prosecute this case. Each failure has entirely prevented this case from moving forward. Furthermore, Petitioner failed to appeal the intermediate state appellate court's denial of his postconviction petition, thereby abandoning his attempt to exhaust his actual innocence claim, which was the sole reason this case has been stayed for the last twenty months. Thus, Petitioner's noncompliance has resulted in almost two years of wasted time.

Moreover, the Court explicitly and repeatedly warned Petitioner that he must "file an amended petition raising all claims on which he wishes to proceed within 28 days of exhausting his actual innocence claim in state court, or the case will be dismissed for failure to prosecute." (Doc. 11 at 6; Text Order dated 2/05/2021). Petitioner egregiously failed to do so, and the Court will stay true to its word.

This factor strongly weighs in favor of dismissal.

### B.   *Apportionment of Responsibility Between Petitioner and Counsel*

Petitioner has no counsel in this case, so he alone bears the responsibility for his disregard of the Court's orders. This factor strongly weighs in favor of dismissal.

### C.   *Effect on the Court's Calendar and Time*

The Petition (doc. 1) has been pending on the Court's docket for almost two years. The Court granted a stay and abeyance to enable Petitioner to exhaust his

5

actual innocence claim, only to have Petitioner stop short of exhausting it by failing to seek review from the Illinois Supreme Court. In addition, Petitioner's failure to prosecute this case has led the Court to spend valuable time investigating the status of Petitioner's state postconviction petition—time that should have been spent on other matters. This factor strongly weighs in favor of dismissal.

### D.    *Prejudice to Defendants*

Defendant was served with Petitioner's motion for stay and abeyance (doc. 9), which presumably required Defendant to consult legal counsel and determine whether to file a response. (*See* Text Order dated 5/19/2020). This factor weighs in favor of dismissal.

### E.    *Probable Merits of the Suit*

The Petition (doc. 1) contains three claims: (1) ineffective assistance of trial counsel for failure to investigate allegedly exculpatory evidence regarding Petitioner's forearm tattoos; (2) a purported *Brady* claim that the victim's description of his assailant's forearm tattoo was not divulged by the State until close to trial; and (3) an actual innocence claim. Each claim would fail on the merits.

### 1.  Ineffective Assistance of Trial Counsel

Petitioner argues his trial counsel was ineffective for failing to investigate when Petitioner received a forearm tattoo. (*See* doc. 1 at 6). Petitioner claims he told his trial counsel he had no forearm tattoos at the time of the robbery and to contact the Psychopathic Ink tattoo shop; he sought to prove he could not have been the robber because he received his forearm tattoos after the robbery occurred. (Doc. 1 at 8).

On postconviction review, the state court held an evidentiary hearing on Petitioner's ineffective assistance of counsel claim. *Id.* ¶ 15. "Trial counsel stated [Petitioner] did not tell him [Petitioner] did not have the tattoos at the time of the offense and did not ask trial counsel to contact the tattoo shop." *Id.* ¶ 19. Furthermore, a "detective from the Normal Police Department testified he arrested [Petitioner] in 2006. While booking [Petitioner] into the McLean County jail, he observed and memorialized in the computer system [that Petitioner] had a cross tattoo on his right forearm. The cross tattoo on [Petitioner's] forearm was also referenced in police reports." *Id.* ¶ 24.

The state court made the following findings:

> (1) the fact [Petitioner] got the Old English-style tattoos approximately one month after the robbery was not in dispute, (2) it was "clear" trial strategy to secure an admission from the male victim [that] he did not recognize the tattoos, (3) trial counsel was credible when he testified [Petitioner] never advised him he did not have forearm tattoos at the time of the robbery, and (4) it was significant [Petitioner] omitted the fact he had the cross tattoo on his forearm at the time of the robbery.

*Id.* ¶ 25. The trial court denied Petitioner's amended postconviction petition, noting Petitioner

> (1) matched the victims' description of the robbers; (2) was seen in possession of the stolen guns just after the home invasion; and (3) sold some of the stolen guns just after the home invasion. Although the victim did not recognize the tattoos, the court found most significant [the fact that Petitioner] had a tattoo on his forearm as the victim recalled three years after the home invasion.
>
> The trial court found (1) [Petitioner] could not demonstrate a reasonable likelihood he would have been found not guilty if trial counsel presented evidence [Petitioner] did not have Old English-style tattoos on the date of the robbery, [and] (2) trial counsel did not perform deficiently . . . .

*Id.* ¶ 26–27.

Petitioner contends the state court made legal and factual errors in denying his ineffective assistance of trial counsel claim. 28 U.S.C. §§ 2254(d)–(e)(1) provide the applicable standard of review:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

First, Petitioner attempts to rebut the state court's finding that Petitioner "never advised [his trial counsel] he did not have forearm tattoos at the time of the robbery." *Manuel*, 2019 IL App (4th) 170651-U, ¶ 25. However, he cannot do so, as he lacks clear and convincing evidence to the contrary. *See* § 2254(e)(1).

Petitioner's evidence consists of his word and the testimony of Psychopathic Ink's owner, who stated "in 2011 or 2012 she spoke to an attorney regarding [Petitioner's] tattoos and offered to help but did not hear anything further. The attorney indicated he represented [Petitioner]." *People v. Manuel*, 2019 IL App (4th) 170651-U, ¶ 16. While the tattoo shop owner's testimony aids Petitioner's story, it

does not clearly and convincingly rebut the state court's finding that the conflicting testimony from Petitioner's trial counsel was credible.

The statements made by Petitioner's trial counsel and Psychopathic Ink's owner do not necessarily contradict one another. Notably, the owner may have spoken with a different attorney, perhaps Petitioner's counsel on direct appeal; Petitioner was convicted in September 2011, *see id.* ¶ 6, and Psychopathic Ink's owner spoke to an attorney "in 2011 *or 2012*," *id.* ¶ 16 (emphasis added). Alternatively, the contact with Psychopathic Ink's owner may have been part of Petitioner's trial counsel's strategy to distinguish Petitioner's tattoos from the "strange looking [tattoo] like two worms crisscrossing" the victim recalled seeing. *Id.* ¶ 6.

> [Petitioner's] trial counsel testified the State disclosed in writing during initial discovery the male victim reported seeing a tattoo on an assailant's forearm. Trial counsel discussed the victim's description of the tattoo with [Petitioner], which trial counsel believed was inconsistent with the tattoos on [Petitioner's] arm. Trial counsel explained his trial strategy was to attempt to get the male victim to admit he did not recognize the tattoo, as the victim ultimately did.

*Id.* ¶ 19. That strategy could well have entailed trial counsel contacting Psychopathic Ink—without Petitioner requesting it—to check when Petitioner received his tattoos or to find an alternative suspect for the robbery with a tattoo that looks like two worms crisscrossing. Either scenario would explain the testimony from Psychopathic Ink's owner.

In addition, Petitioner's story does not hold water. He claims he had no forearm tattoos at the time of the 2008 robbery, (doc. 1 at 7), but his 2006 arrest documented

Petitioner's forearm cross tattoo, *Manuel*, 2019 IL App (4th) 170651-U, ¶ 24.[2] Thus, Petitioner was caught misrepresenting the facts. In light of his misrepresentation, Petitioner's purported statement to his trial counsel is not credible.

Given the lack of clear and convincing evidence to the contrary, the Court must presume the state court's factual determination is correct: Petitioner did not advise his trial counsel he had no arm tattoos at the time of the robbery.

Second, Petitioner claims the state court "unreasonably applied" the *Strickland* test for ineffective assistance of counsel. (Doc. 1 at 24–25). Section 2254(d)(1) sets an extremely high bar for questions of law, which Petitioner is unable to clear.

> An "unreasonable application of" federal law means "objectively unreasonable, not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotations and citation omitted). "[A] state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

*Neal*, 788 F.3d at 263.

Under *Strickland v. Washington*, Petitioner must demonstrate (1) his trial counsel's performance fell below an "objective standard of reasonableness" and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). "This is a highly

---

[2] Petitioner still has that cross tattoo on his forearm; he clearly did not have that tattoo removed between his 2006 arrest and the 2008 robbery. *See* James Ray Manuel, Illinois Department of Corrections Prisoner Search, https://www2.illinois .gov/idoc/Offender/Pages/InmateSearch.aspx ("TATTOO, FOREARM, RIGHT – CROSS").

deferential inquiry; 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Hicks v. Hepp*, 871 F.3d 513, 525 (7th Cir. 2017) (quoting *Strickland*, 466 U.S. at 690).

Petitioner cannot demonstrate the state court unreasonably applied *Strickland*. As discussed in the preceding paragraphs, the Court must presume Petitioner did not inform his trial counsel he had no tattoos at the time of the robbery. Given that Petitioner did not tell his trial counsel he had no tattoos at the time of the robbery, his trial counsel can hardly have been ineffective for failing to pursue that theory. By all accounts, Petitioner's counsel successfully executed his trial strategy by getting the male victim to admit he did not recognize Petitioner's tattoos. While it did not ultimately result in an acquittal, the strategy was sound. Clearly, trial counsel's performance did not fall below an objective standard of reasonableness. Consequently, the state court did not unreasonably apply the first prong of *Strickland*.

In addition, Petitioner cannot establish prejudice, as the trial's result would not have been different even if trial counsel had pursued Petitioner's no-forearm-tattoo theory.

> [E]ven if counsel had called the shop and even if counsel had presented evidence defendant did not have Old English style tattoos at the time of the offense, the result would not have been different. [Petitioner's] tattoos were only part of the coalescence of "amazing coincidence[s]" leading to the court's finding of guilt. [Petitioner] matched the victim's description, and just after the home invasion, [Petitioner] was seen in possession of the stolen guns and then sold some of the stolen guns. Moreover, the victim did not recognize [Petitioner's] tattoos, which

> would not have changed even if counsel established [Petitioner] did not have the Old English style tattoos at the time of the offense. The court found most significant the fact [Petitioner] had a tattoo on his forearm at the time of the offense, just as the victim recalled three years after the home invasion.

*Manuel*, 2019 IL App (4th) 170651-U, ¶ 41.

Petitioner attempts to rebut the state court's ruling that he was not prejudiced by claiming it rests on an unreasonable determination of the facts. (Doc. 1 at 11).

> "A petitioner's challenge to a state court decision based on a factual determination under § 2254(d)(2) will not succeed unless the state court committed an 'unreasonable error.'" *Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011). Under § 2254(d)(2), a state court decision is "based on an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Newman* [*v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013)] (internal quotation marks and citation omitted). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) (second brackets and ellipses in original).

*Pruitt v. Neal*, 788 F.3d 248, 263 (7th Cir. 2015).

Petitioner claims the state court made an unreasonable determination of the facts when it found Petitioner "(1) matched the victims' description of the robbers; (2) was seen in possession of the stolen guns just after the home invasion; and (3) sold some of the stolen guns just after the home invasion." *Manuel*, 2019 IL App (4th) 170651-U, ¶ 26. Petitioner alleges factual error because the victims did not identify him at trial, he was not caught with the firearms stolen in the robbery, the witness who saw Petitioner with the bag containing the stolen firearms did not specify precisely when she saw him, and the witness who testified to purchasing one of the

stolen guns from Petitioner only identified him in a photo array—not in court. (*See* doc. 1 at 12).

Petitioner's argument is unavailing. First, given that the robbers wore masks, it is unsurprising that the victims did not visually identify him in court; the fact remains that Petitioner matched the victims' descriptions of their assailant. Second, a witness's failure to specify precisely when she observed Petitioner with the bag containing the stolen firearms does not obviate what she saw. Third, Mr. Diciaula's choice to not identify Petitioner in court as the man who sold him some of the stolen guns years prior[3] does not defeat his prior identification of Petitioner from a photo array.

It is obvious the state court did not ignore the clear and convincing weight of the evidence; its factual findings were not unreasonable.[4] Consequently, Petitioner cannot demonstrate prejudice or that *Strickland* was unreasonably applied "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

---

[3] "When asked if the [person who sold him the stolen guns from the robbery] was in the courtroom, Diciaula testified 'I think so, but I honestly can't identify him from—I've only met him one time, and I don't want to point at the wrong person.' " *People v. Manuel*, 2013 IL App (4th) 120017-U, ¶ 24.

[4] Petitioner also challenges the factual determination that he "never advised [his trial counsel] he did not have forearm tattoos at the time of the robbery." *Manuel*, 2019 IL App (4th) 170651-U, ¶ 25. As discussed in the preceding paragraphs, there is no clear and convincing evidence to rebut that finding, so the Court must presume it to be correct. Even without that mandatory presumption, at best (for Petitioner) reasonable minds can disagree about whether to believe Petitioner or his trial counsel given the facts presented to the state court. Reasonable disagreement is insufficient for Petitioner to prevail under § 2254(d)(2).

In light of the above discussion, it is clear Petitioner's ineffective assistance of counsel claim would fail on the merits.

## 2. *Brady*

"Petitioner contends the State violated his right to a fair trial under *Brady v. Maryland*, 373 U.S. 83, 87[] (1963), by deliberately failing to reduce a Witness's oral statement to writing so it could be tendered to the defense in discovery." (Doc. 1 at 19 (italicization added)).

> To warrant a finding of a *Brady* violation, a defendant must point to specific evidence that was (1) favorable to the defense; (2) suppressed by the government; and (3) "material to an issue at trial." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015) (quotation marks omitted).
>
> Evidence is favorable to the defense when it is either exculpatory or could be used for purposes of impeachment. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).
>
> . . . "Evidence is suppressed when 'the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.' " *Shields*, 789 F.3d at 746–47 (quoting *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)).
>
> A mid-trial disclosure "suffices if time remains for the defendant to make effective use of the exculpatory material." *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996); *see also Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) ("Even late disclosure does not constitute a *Brady* violation unless the defendant is unable to make effective use of the evidence.").

*United States v. Lawson*, 810 F.3d 1032, 1042–43 (7th Cir. 2016).

Here, on "August 8, 2011, the day petitioner's trial was initially scheduled to begin, the State revealed to the Defense that the complainant, Lester Hopper, made an oral statement about seeing a specific type of tattoo on the forearm of one of the

two assailants who forcibly entered his residence." (Doc. 1 at 19). Petitioner complains this eleventh-hour disclosure violated *Brady*.

> However, Petitioner's
>
> trial counsel testified the State disclosed in writing during initial discovery the male victim reported seeing a tattoo on an assailant's forearm. Trial counsel discussed the victim's description of the tattoo with [Petitioner], which trial counsel believed was inconsistent with the tattoos on [Petitioner's] arm. Trial counsel explained his trial strategy was to attempt to get the male victim to admit he did not recognize the tattoo, as the victim ultimately did."

*Manuel*, 2019 IL App (4th) 170651-U, ¶ 19. Not only does Petitioner's trial counsel contradict Petitioner's claims about when this evidence was disclosed by the State, it makes clear Petitioner received the evidence in sufficient time to make use of it at trial. Namely, Petitioner's trial counsel formed a plan to use the evidence at issue and executed it successfully, getting the victim to admit he did not recognize the tattoo on Petitioner's forearm. Therefore, even if the evidence was disclosed as late as Petitioner claims, no *Brady* violation occurred, as "late disclosure does not constitute a *Brady* violation unless the defendant is unable to make effective use of the evidence." *Bielanski*, 550 F.3d 632, 645 (7th Cir. 2008).

### 3. Actual Innocence

Petitioner contends he should be granted habeas relief because he is innocent. It is unclear whether freestanding innocence claims are cognizable on habeas review. "[N]either the Supreme Court nor [the Seventh Circuit] has yet indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a non-

capital case." *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018).[5] Indeed, the Seventh Circuit has "characterized as 'doubtful' the notion that such a claim could support relief on collateral review of a conviction." *Id.* (quoting *Perrone v. United States*, 889 F.3d 898, 903 (7th Cir. 2018)).[6]

Moreover, even if a freestanding innocence claim were cognizable on habeas review, the "evidence of innocence [would] need to meet an 'extraordinarily high' threshold." *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017) (quoting *Herrera v. Collins*, 506 U.S. 390, 392 (1993)). This threshold has not been determined, but it must be higher than the standard required for innocence to excuse procedural default. *House v. Bell*, 547 U.S. 518, 555 (2006) (holding a petitioner who had satisfied the *Schlup* standard nonetheless could not meet the standard for a substantive actual innocence claim); *Arnold*, 901 F.3d at 838.

For innocence to forgive procedural default, a petitioner must offer "new reliable evidence" not presented at the original trial demonstrating "it is more likely

---

[5] Although language in the majority opinion in *Herrera* appears to bar habeas claims based solely on actual innocence, the concurring opinion of Justices O'Connor and Kennedy makes clear that a majority of justices agree that habeas relief would be warranted upon a truly persuasive showing of actual innocence, at least in a capital case. [*Herrera v. Collins*, 506 U.S. 390, 427 (1993)] (O'Connor, J., concurring).
*Gomez v. Jaimet*, 350 F.3d 673, 681 n.1 (7th Cir. 2003).

[6] Actual innocence is undoubtedly cognizable under the Illinois Constitution, *People v. Washington*, 665 N.E.2d 1330, 1337 (1996), but Illinois's recognition of the claim does not affect the claim's cognizability on federal habeas review, *Evans v. Lashbrook*, No. 17 C 8571, 2020 U.S. Dist. LEXIS 52413, 2020 WL 1468381, at *4 (N.D. Ill. Mar. 26, 2020).

than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).

Here, Petitioner recites the lesser *Schlup* standard, contending it is more likely than not that no reasonable juror would have convicted him in light of his alibi witness, Robert Whittier, and the evidence from Psychopathic Ink. (Doc. 1 at 6).

Petitioner claims that approximately eleven years after his conviction, a former coworker, Robert Whittier, came forward with the alibi that he and Petitioner were working in Chicago at the time the robbery occurred in Bloomington, Illinois. (Doc. 1 at 18). Petitioner raised this argument for the first time in a successive petition for postconviction relief in state court. (Doc. 1 at 17–18).

> Whittier's affidavit, signed March 9, 2019, averred he and [Petitioner] worked together doing home repairs while "employed sporadically by Willie James Mangum." In November 2014, Mangum died. The affidavit averred Whittier and [Petitioner] were working together at a residence located at "93rd & Woodlawn in Chicago, Illinois on July 28th, July 29th, and July 30th in the year 2008 from 7:00 p.m. to 11 p.m." [Petitioner] remained within Whittier's eyesight "during the aforementioned times and dates as [they] worked together." Whittier did not come forward with this information sooner because he "lost contact with [Petitioner] in the month of Augusy *[sic]* 2008," and had no knowledge of [Petitioner's] arrest and subsequent incarceration prior to December 2018.
>
> [Petitioner] also attached his own affidavit to the motion. [Petitioner's] affidavit, signed March 20, 2019, averred he worked with Whittier doing home repairs in Chicago, Illinois, throughout 2007 and 2008. The affidavit averred police confiscated certain items from [Petitioner] upon his arrest in September 2008, including his cellular telephone. [Petitioner's] cellular telephone contained Whittier and Mangum's phone numbers. Following his incarceration, [Petitioner] was informed if he wanted to maintain possession of the confiscated items, he had 30 days to mail them to an address of his choosing, otherwise the items would be destroyed. [Petitioner] "allowed correctional officers to destroy [his] cellular telephone and [his] other personal property." The affidavit also averred [Petitioner] did not inform his trial counsel of Whittier's or

Mangum's testimony because he "could not have provided [his] trial counsel with the contact information for the two potential alibi witnesses."

The trial court denied [Petitioner] leave to file his successive postconviction petition and found [Petitioner] failed to offer any plausible explanation as to how, with due diligence, he was unable to develop or discover Whittier's testimony prior to trial. The court stated further:

> Petitioner cannot claim that he was unaware of Robert Whittier as a potential witness when both the affiant and petitioner agree to what amounts to an alibi for petitioner, *i.e.* affiant was with petitioner while the crime was taking place elsewhere. Petitioner's explanation for why he was unable to provide any information to his attorney about this alibi witness—that petitioner had no 'contact' information—falls woefully short of due diligence. Even if [Petitioner] did not know the address or telephone number for Mr. Whittier, he had his name which he could have provided to counsel who then could have attempted to locate the witness.

*Manuel*, 2021 IL App (4th) 190238-U, ¶¶ 15–17.

In addition, Petitioner offers evidence from a tattoo shop named Psychopathic Ink.

> The owner of the tattoo shop testified regarding a "release of liability." She explained the release was filled out in her boyfriend's handwriting and [Petitioner] had to have signed the release before getting the tattoos. She also testified in 2011 or 2012 she spoke to an attorney regarding [Petitioner's] tattoos and offered to help but did not hear anything further. The attorney indicated he represented [Petitioner].

> An employee of the tattoo shop testified he filled out the release of liability and had [Petitioner] sign and date it before giving [Petitioner] the tattoos. He explained the description on the release, "outline old E," referenced a tattoo in Old English-style lettering. After viewing the Old English-style tattoos on the back of [Petitioner's] forearm, he testified it appeared they were done at the same time.

*Manuel*, 2019 IL App (4th) 170651-U, ¶¶ 16–17.

Petitioner cannot satisfy even the lesser *Schlup* standard here. Although he provides evidence not presented at his trial,[7] that evidence does not make it more likely than not that no reasonable factfinder would have convicted him. It is incredible that Petitioner would not have bothered to tell trial counsel about his alleged alibi simply because he did not have Robert Whittier's phone number available.

The Psychopathic Ink evidence is insufficient as well. It demonstrates Petitioner got Old English-style forearm tattoos approximately one month after the robbery, which the state court found was "not in dispute." *Manuel*, 2019 IL App (4th) 170651-U, ¶ 25. However, the state court found it "significant [Petitioner] omitted the fact he had the cross tattoo on his forearm at the time of the robbery." *Id.* "Although the victim did not recognize [Petitioner's] tattoos, the court found most significant [that Petitioner] had a tattoo on his forearm as the victim recalled three years after the home invasion." *Id.* ¶ 26.

As previously stated, in addition to having a forearm tattoo like the robber, Petitioner "(1) matched the victims' description of the robbers; (2) was seen in possession of the stolen guns just after the home invasion; and (3) sold some of the stolen guns just after the home invasion." *Id.* Given the totality of the evidence,[8]

---

[7] In the Seventh Circuit, a petitioner may use "new" evidence that he knew about when his trial occurred; "[a]ll *Schlup* requires is that the new evidence is reliable and that it was not presented at trial." *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003).

[8] [T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what

Petitioner fails to demonstrate that, more likely than not, no reasonable juror would have found him guilty beyond a reasonable doubt. Thus, because Petitioner cannot satisfy the lower *Schlup* standard, he cannot satisfy the higher standard for a freestanding innocence claim—if such a claim is even cognizable. Accordingly, Petitioner's claim would fail.[9]

Given that each of Petitioner's claims would fail, this *McMahan* factor weighs in favor of dismissal.

    F.    *Consequences of Dismissal for Habeas Petitions' Social Objectives*

The social objective of habeas corpus review of state convictions is to remedy wrongful convictions predicated on federal law. In general, this purpose is undermined when habeas petitions are dismissed with prejudice without their merits having been reached.

However, "the apparent weakness of a case may give rise to an inference that . . . dismissal will not impair the objectives of the law under which the [petitioner] is

---

reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

*House v. Bell*, 547 U.S. 518, 538 (2006).

[9] Petitioner's actual innocence claim is also procedurally defaulted. This Court stayed the Petition so that Petitioner could exhaust this actual innocence claim in state court. Petitioner's petition raising his actual innocence claim was denied by the state's intermediate appellate court on May 26, 2021. *See Manuel*, 2021 IL App (4th) 190238-U. However, Petitioner failed to seek review from the Illinois Supreme Court within thirty-five days of the intermediate appellate court's denial as required. *See* Ill. Sup. Ct. R. 315(b). Failure to comply with a state procedural rule bars federal habeas corpus review unless the petitioner can demonstrate entitlement to an exception such as cause and prejudice. *See Wainwright v. Sykes*, 433 U.S. 72, 82–83, 87 (1977). There are no facts to suggest Petitioner's procedural fault would be excused, and it is unlikely it would be.

proceeding." *Aura Lamp & Lighting Inc. v. Int'l Trading Corp.*, No. 00 C 2098, 2002 U.S. Dist. LEXIS 2133, at *7 (N.D. Ill. Feb. 11, 2002) (footnote omitted) (citing *Ball v. City of Chi.*, 2 F.3d 752, 759 (7th Cir. 1993)).

Such an inference is appropriate here. The objective of the instant Petition is the release of Petitioner, who was convicted in 2011 and sentenced to forty-five years of incarceration for home invasion and armed robbery. (Doc. 1 at 1). If Petitioner had any genuine grounds for release—or appeared to be innocent—dismissal might not be appropriate. Yet as this opinion has detailed, Petitioner's claims would not prevail on the merits, and he does not appear innocent. Given that, this dismissal does not harm the social objectives of habeas corpus under 28 U.S.C. § 2254.

The previous paragraph notwithstanding, this factor weighs more against dismissal than in its favor. Thus, five of the six *McMahan* factors weigh in favor of dismissal here.

## II.    Dismissal with Prejudice Is Warranted

Petitioner was explicitly warned failure to follow the Court's orders would result in the Petition being dismissed. Nevertheless, Petitioner chose to ignore the Court's directives.

Given Petitioner's apparent concealment of the intermediate appellate court's denial of his state postconviction petition and blatant disregard of the Court's orders, the Court finds dismissal without prejudice is an insufficient sanction to address Petitioner's conduct. *See Collier v. SP Plus Corp.*, 889 F.3d 894, 897 (7th Cir. 2018) ("A Rule 41(b) dismissal [with prejudice] is a harsh sanction appropriate only when . . . other less drastic sanctions [are] unavailing.").

21

Given Petitioner's repeated noncompliance with court orders, failure to prosecute this case, and the five *McMahan* factors favoring dismissal, the Court concludes dismissal with prejudice under Rule 41(b) is warranted.[10] This dismissal constitutes an adjudication on the merits. *See* Fed. R. Civ. P. 41(b).

## CONCLUSION

IT IS THEREFORE ORDERED that the Petition (doc. 1) is DISMISSED WITH PREJUDICE. This matter is TERMINATED.

SO ORDERED.

Entered this 18th day of March 2022.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge

---

[10] As Rule 41(b) enables dismissal, the Court need not address whether it could dismiss the case with prejudice using its inherent authority. *See Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 390–91 (7th Cir. 2002) (holding the "inherent authority of federal courts . . . [should] be exercised sparingly, to punish misconduct . . . not adequately dealt with by other rules"); *Goodvine v. Carr*, 761 F. App'x 598, 602 (7th Cir. 2019) ("We ordinarily encourage reliance on a statute or rule before the invocation of inherent authority . . . .").